IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHRYL HARDIN
formerly Chryl Stinchcomb                                          PLAINTIFF

    v.              Case No. 04-5058

CONTINENTAL CASUALTY COMPANY
and CNA GROUP LIFE ASSURANCE COMPANY                              DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, challenging defendants' decision to deny her application for long-term disability benefits. Defendants have submitted the administrative record (the "AR") that was before the claims administrator (Doc. 7) and plaintiff has submitted a "supplemental administrative record" (Doc. 8), which she argues should be considered by the Court. The parties have submitted briefs (Docs. 9, 12) on the issues before the Court and the matter is now ripe for consideration. For the reasons stated below, the Court finds that defendants' decision was not supported by substantial evidence and a separate judgment will be entered in favor of plaintiff.

**Background**

1. Plaintiff worked for J.B. Hunt Transport Services ("J. B. Hunt") as a driver recruiter. According to J.B. Hunt's written job profile and demands analysis of plaintiff's position,

1

plaintiff's primary responsibility was to make 100 phone calls a day for a total of 500 phone calls a week "selling J.B. Hunt to [p]rofessional drivers." Plaintiff was required to schedule at least ten drivers per week for orientation and to recruit two hires per week. (AR 203 - 204.) Plaintiff's other responsibilities included:

* Always represent the Company with behavior representing a Sales Professional.

* Be an active proponent of all operating groups, including Van, DCS and the Independent Contractor program.

* Keep an eye on the competitions' successes and failures and communicate these to management.

* Keep up to date with industry news and events, communicating relevant information back to a manager.

* Develop your own database supplied by J.B. Hunt . . . entering all leads for optimum production and follow up.

* Always meet and[/]or exceed minimum production goals.

The qualifications for plaintiff's position included:

* Excellent communication skills, both oral and written.

* Ability to positively respond and interact with all professional drivers.

* Must possess good reasoning, decision-making and organizational skills.

* Abilit[y] to work effectively unsupervised, under pressure with deadlines.

* Must be a willing and effective team participant.

(AR 203.)

2. Plaintiff participated in an employee benefits plan sponsored by J.B. Hunt and issued and administered by defendants. On May 21, 2002, J.B. Hunt's benefits department submitted an application for long-term disability benefits on plaintiff's behalf to defendants. (AR 200.) The forms completed by J.B. Hunt in connection with plaintiff's application reflected that plaintiff had taken three leaves-of-absence for "depression" from February to November 2001, and that her last day of work was January 7, 2001. (AR 201 - 202.)

3. Under the terms of the plan, plaintiff was eligible for long-term disability benefits "for each month of Total Disability which continue[d] after the Elimination Period," which ended July 6, 2002. (AR 3, 8, 11-12.) During the elimination period and first 24 months the monthly benefit is payable, an employee is considered to have a "Total Disability" if she is continuously unable to perform the substantial and material duties of her regular occupation. (AR 12.) Benefits are not payable beyond 24 months after the elimination period if the disability "is due to mental or emotional disorders...." (AR 13.)

4. The documentation submitted in support of plaintiff's claim for disability benefits reflects the following:

\*   Plaintiff has a history of major depression and she began seeking treatment from her primary-care physician, Dr. Cynthia Wilson, in June 2001. Plaintiff saw Dr. Wilson on a consistent

3

basis from June 2001 through May 2002, for complaints of depression and anxiety and also for complaints of back pain and headaches following a motor-vehicle accident in February 2002. Dr. Wilson prescribed plaintiff Prozac, Xanax, Flexeril, and Neurontin. (AR 65 - 94.)

\*      Dr. Wilson referred plaintiff to a neurologist, Dr. Michael Morse, for her complaints of pain. Dr. Morse's findings were as follows:

> She has a significant amount of pain behavior. I don't find any abnormality on neurological examination. The abnormalities on her MR are minimal and should not limit her. I recommended that she be more aggressive in her physical therapy and get back to work. She needs her depression treated in a more aggressive way and apparently is seeing someone about that. (AR 107.)

\*      On May 9, 2002, Dr. Wilson completed an "Attending Physician's Certification of Health Condition" form submitted to her by J.B. Hunt's benefits department. Dr. Wilson diagnosed plaintiff with depression and anxiety and with back pain and headaches resulting from the motor-vehicle accident. Dr. Wilson concluded that plaintiff was unable to perform work of any kind and that a return to work date was unknown, as the duration of her conditions was indefinite. (AR 210 - 212.)

\*      On May 20, 2002, Dr. Wilson completed a "Functional Assessment Tool" submitted to her by defendants. Dr. Wilson opined that plaintiff was "very depressed [and] having panic attacks" and that she was "mentally unable to return to work." (AR 113.)

4

\* Beginning in December 2001 and continuing through June 2002, plaintiff saw Dr. Stanley Rest approximately twice a month for psychotherapy. During her sessions with Dr. Rest, plaintiff consistently reported feeling depressed, anxious, and overwhelmed and revealed to Dr. Rest that she had been raped by her father, that she had a medical malpractice lawsuit pending against her former therapist and psychiatrist, that she was having marital problems, that her son had been arrested for manufacturing methamphetamine, and that she had been in a motor vehicle accident.

Dr. Rest identified plaintiff's "issues/problems" as:

> Reaction To Trauma
> Relational Difficulty
> Grief or Loss
> Family Problems
> Legal Conflict

Dr. Rest diagnosed plaintiff as suffering from post-traumatic stress disorder, borderline personality disorder, anxiety and depression. (AR 140 - 175.)

\* Dr. Rest referred plaintiff to a psychiatrist, Dr. Aubrey Pat Chambers, for "medication treatment." The medical documentation submitted to defendants contains records of only two appointments with Dr. Chambers, one on February 11, 2002, and the other on March 29, 2002, but there are references to other appointments. Dr. Chambers' notes from plaintiff's February 11, 2002 appointment state, "The patient was last seen by me in July. She carries a diagnosis of PTSD, a previous diagnosis of Multiple

Personality Disorder, and Borderline Syndrome...." Dr. Chambers' assessment was "Affective syndrome: R/O PTSD with Adjustment Disorder .... I doubt Major Depression." Dr. Chambers suggested increasing plaintiff's Xanax. (AR 162.) Dr. Chambers' assessment at plaintiff's March 29, 2002 appointment was "increased Major Depression, and Posttraumatic Stress Disorder." (AR 154.)

* On May 9, 2002, Dr. Rest completed an "Attending Physician's Certification of Health Condition" form and a "Physician's Statement" form submitted to him by J.B. Hunt's benefits department. Dr. Rest opined that plaintiff was mentally incapacitated indefinitely. (AR 206 - 207, 214 - 216.)

5. On July 8, 2002, defendants denied plaintiff's claim for long-term disability benefits, explaining:

> [Y]ou are employed with J.B. Hunt as a[n] Inside Recruiter. The job information received from your employer indicates this position mostly requires sitting and the use of telephone and computer. The primary function of this position is to call people off a call sheet and speak with them regarding employment with J.B. Hunt and scheduling drivers to attend orientation.
>
> Based on our review, the information received does not support an impairment to functionality which would preclude you from performing the material and substantial duties of your regular occupation from your date of loss of 1/8/02 through your Elimination Period. (AR 100.)

Defendants summarized the evidence supporting their denial of benefits as follows:

6

* Office notes from plaintiff's visit with Dr. Wilson on May 7, 2002, indicated that plaintiff was less depressed and that she would be "reviewed to be released" after her appointment with the neurologist. Further, Dr. Wilson noted no functional limitations or restrictions.

* Plaintiff's neurological examination revealed no abnormalities and the neurologist recommended that plaintiff return to work.

* Dr. Chambers noted no functional limitations or restrictions.

* Dr. Rest's psychotherapy notes indicated that as of January 8, 2002, plaintiff was "able to sustain substantial gainful employment with support and prompting.... Remaining progress notes indicate[d] focus on situations related to family and legal issues. No functional limitations or restrictions were noted." (AR 100.)

6. Plaintiff retained counsel and appealed the denial of benefits.

* On July 23, 2002, defendants advised plaintiff that she had until January 3, 2003, to submit additional medical information in support of her claim. (AR 95 - 96.)

* On October 29, 2002, plaintiff's counsel advised defendants, "I should have collected medical and have that forwarded to you in an index shortly." (AR 63.)

7

* On December 11, 2002, defendants wrote plaintiff's counsel, stating that they had not received any additional medical records and that they would grant him an additional thirty days, until February 3, 2003, to submit any additional information he wished to be considered in the re-evaluation of plaintiff's claim. (AR 62.)

* On February 12, 2003, defendants wrote plaintiff's counsel stating that they had not received any additional medical records and "[t]herefore, this claim has been submitted for a formal appeal review with the information on file at this time." (AR 61.)

* On April 1, 2003, a registered nurse on defendants' appeals committee wrote plaintiff's counsel advising:

> As you must know, claims of disability are not alone paid on self-reported symptoms or self-reported limitations. Neither are disability claims approved solely on the presence of a diagnosis or prescribed treatment or[] alone based on a physician's statement indicating a "no work" status. Instead, claims of disability are based on the review of presenting medical evidence and documentation and the effort to correlate that information to self-reported symptoms, alleged functional limitations, and the treating physicians' opinions with regard to occupational restrictions and/or limitations....
>
> After a full review of the Company's original determination and[] following an independent review of the medical evidence and documentation made available, Appeals finds reasonable the outcomes and conclusions of the Company's benefit determination and concurs with the findings therein....

> This concludes the Appeals Review Process. Please be advised that with the completion of this process, all of the available administrative remedies (for further pursuing benefits in this claim) have now been exhausted and the administrative record in this matter (your client's claim file) has been closed. Also be advised that the appellate decision rendered today, as of the date of this letter, is to be considered in this matter the company's final decision. (AR 47-48.)

* On July 10, 2003, plaintiff's current attorney wrote a letter to the Appeals Committee advising that he had been retained to represent plaintiff and that he had "additional information to provide in regard to [plaintiff's] disability benefits." (AR 45.)

* In a letter dated July 11, 2003, the Appeals Committee responded that an appellate decision upholding the denial of benefits had been issued on April 1, 2003, and that this constituted defendants' final decision and plaintiff's claim file had been closed. (AR 42.)

**Discussion**

* **Standard of Review**

1. ERISA provides a plan beneficiary with the right to judicial review of a benefits determination. *See* 29 U.S.C. § 1132(a)(1)(B). A denial of benefits by a plan administrator must be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the administrator's decision is reviewed for an abuse of discretion. *See Firestone*

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under the terms of plaintiff's employee benefits plan, the "Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan." (AR 36.) Accordingly, defendants' decision will be reviewed for an abuse of discretion.

2. Under the abuse-of-discretion standard, the Court must determine whether a reasonable person could have reached the same decision. *See House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001). This inquiry focuses on the presence or absence of substantial evidence supporting the administrator's decision. *Id.* While the administrator's decision need not be supported by a preponderance of the evidence, there must be "'more than a scintilla.'" *Id.* (citations omitted).

* **Record on Review**

3. Plaintiff urges the Court to consider not just the administrative record that was before defendants when they issued their decision, but a "supplemental administrative record" consisting of the documentation plaintiff attempted to submit to the Appeals Committee after it had already issued its decision and closed plaintiff's claim file.

4. Plaintiff had approximately seven months (from July 23, 2003 to February 3, 2003) in which to submit any additional

10

information she wished to be considered in the re-evaluation of her claim by the Appeals Committee. Plaintiff offers no explanation as to why she did not submit the documentation contained in the proposed "supplemental administrative record" to the Appeals Committee during this time frame. Even if plaintiff could demonstrate good cause for failing to timely submit the documentation to the Appeals Committee, "[w]hen reviewing a denial of benefits by an administrator who has discretion under an ERISA-regulated plan, a reviewing court 'must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence ....'" *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (citation omitted). Thus, the "supplemental administrative record" submitted by plaintiff will not be considered by the Court.

    **\*    Defendants' Denial of Benefits**

5. In their initial decision denying plaintiff benefits, defendants found that plaintiff's impairments did not prevent her from performing the duties of her position as a driver recruiter, as the position:

> mostly require[d] sitting and the use of telephone and computer [and] [t]he primary function of this position [was] to call people off a call sheet and speak with them regarding employment with J.B. Hunt and schedul[e] drivers to attend orientation. (AR 100.)

Defendants did not address the impact plaintiff's mental impairments had on her other job responsibilities, which, according to J.B. Hunt's written job profile and demands analysis, included: being an active proponent of all operating groups; monitoring the competitions' successes and failures; keeping up to date with industry news and events; developing a database on all leads; and meeting or exceeding minimum production goals of making 100 phone calls a day for a total of 500 phone calls a week, scheduling at least ten drivers per week for orientation, and recruiting two hires per week. (AR 203 - 204.) Defendants also did not address the impact plaintiff's mental impairments had on her qualifications for the job, which included: excellent communication skills, both oral and written; the ability to positively respond and interact with drivers; good reasoning, decision-making and organizational skills; and the ability to work effectively unsupervised, under pressure with deadlines. (AR 203.)

6. Defendants based their initial denial of benefits, in part, on the fact that Dr. Rest, plaintiff's psychotherapist, indicated that plaintiff was able to sustain employment with support and prompting as of January 2002, the focus of plaintiff's subsequent sessions with Dr. Rest related to family and legal issues, and Dr. Rest noted no functional limitations or restrictions. However, as of May 2002, Dr. Rest had diagnosed plaintiff as suffering from post-traumatic stress disorder,

12

borderline personality disorder, anxiety and depression, and Dr. Rest opined that plaintiff was mentally incapacitated indefinitely. (AR 206 - 207, 214 - 216.) Dr. Rest's diagnosis is corroborated by plaintiff's psychiatrist, Dr. Chambers, whose last assessment of plaintiff's condition was that she was experiencing "increased Major Depression, and Posttraumatic Stress Disorder." (AR 154.)

7. Defendants also relied on an office note dated May 7, 2002, in which Dr. Wilson, plaintiff's primary-care physician, noted that plaintiff was less depressed and would be "reviewed to be released" after a neurological examination; the neurological examination revealed no abnormalities and the neurologist recommended that plaintiff return to work. The neurologist clearly only assessed plaintiff's ability to return to work from a physical standpoint and, in fact, noted that plaintiff needed "her depression treated in a more aggressive way." (AR 107.)

Defendants focused on an isolated visit with Dr. Wilson when plaintiff reported being less depressed. However, plaintiff saw Dr. Wilson on a consistent basis for approximately one year and Dr. Wilson, like Dr. Rest, diagnosed plaintiff with depression and anxiety and prescribed her various medications for these conditions. As of May 20, 2002, Dr. Wilson reported that plaintiff was "very depressed [and] having panic attacks." Further, Dr. Wilson did in fact review the possibility of plaintiff returning to

13

work and concluded that plaintiff was "mentally unable" to perform work of any kind and that a return to work date was unknown.

8. Defendants denied plaintiff's appeal, explaining that disability benefits are not awarded based on self-reported symptoms or even a diagnosis or a physician's "statement indicating a 'no work' status." (AR 47-48.) Defendants concluded that the medical evidence did not correlate to plaintiff's "self-reported symptoms, alleged functional limitations, and the treating physician's opinions ..." (Id.) In reaching this conclusion, it appears that defendants relied on the opinion of a registered nurse on the Appeals Committee who reviewed plaintiff's medical records. However, the nurse's opinion cannot be considered substantial evidence supporting defendants' decision, in light of the fact that plaintiff's primary care physician and psychotherapist both concluded that plaintiff was mentally unable to return to work.

9. Under the terms of the benefits plan, defendants had the right, at their own expense, to have a physician examine plaintiff. (AR 15.) Had defendants required plaintiff to submit to an independent medical examination or had they even had a psychologist or psychiatrist, rather than a registered nurse, review plaintiff's medical records, they perhaps would have been justified in discounting plaintiff's treating physicians' opinions in favor of a contrary opinion produced by an independent exam or review. *See Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996) ("where there

is a conflict of opinion, the plan administrator does not abuse his discretion in finding that the employee is not disabled"). Defendants did not do so, however, and they did not possess even a scintilla of evidence refuting the documentation supporting plaintiff's entitlement to benefits. *See House*, 241 F.3d at 1048 (administrator improperly denied employee's claim for disability benefits where it had no evidence refuting documentation from plaintiff's treating specialist that supported entitlement to benefits; even if documentation could be dismissed as subjective, plan's terms did not support insurer's demand for objective medical evidence but only to require employee to submit to independent medical examination, which administrator did not do).

**Conclusion**

10. Based on the foregoing, the Court concludes that defendants abused their discretion in denying plaintiff disability benefits. The medical evidence clearly indicates that plaintiff's disability was due to a "mental or emotional disorder." Accordingly, under the terms of the plan, plaintiff is only entitled to an award of benefits for the 24 month period following the elimination period – from July 7, 2002, through July 7, 2004.

11. The parties shall have ten days from entry of this order in which to confer and submit a written stipulation calculating the total award due plaintiff so that a judgment may be entered accordingly.

12. Further, the Court will consider awarding a reasonable attorney's fee and costs to plaintiff under 29 U.S.C. § 1132(g). Plaintiff shall submit an application for fees and costs, including an itemization and affidavit and a brief supporting her argument as to why an award of fees and costs would be appropriate in this case, within ten days as well. Defendants shall have ten days thereafter in which to file a response.

IT IS SO ORDERED this 25th day of October 2005.

/S/JIMM LARRY HENDREN
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE